UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

BRETT SCOTT,                                   :

                         Petitioner,            :        **REPORT AND**
                                              **RECOMMENDATION**
             - against -            :        **TO THE HONORABLE**
                                              **RICHARD M. BERMAN**

FLOYD G. BENNET, JR., Superintendent,          :
Elmira Correctional Facility,                          01 Civ. 11397 (RMB)(FM)
                                         :

                         Respondent.           :

                                         :
--------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

I.     Introduction

          Petitioner Brett Scott ("Scott") brings this <u>pro</u> <u>se</u> habeas corpus proceeding,

pursuant to 28 U.S.C. § 2254, to challenge his conviction on two counts of Robbery in the

First Degree, following a jury trial in Supreme Court, New York County, and on one count

of Criminal Sale of a Controlled Substance in the Third Degreee, following his guilty plea

in that court.  (<u>See</u> Pet. ¶¶ 1, 4-6; Decl. of Ass't Att'y Gen. Jennifer K. Danburg, dated

January 16, 2003 ("Danburg Decl."), Ex. A at 1A).  On March 13, 1997, the trial judge,

Justice William Leibovitz sentenced Scott to thirteen years of imprisonment on each

robbery count, to be served consecutively.  (S. 34).[1]  On March 18, 1997, Justice Edwin

---

[1]      "S." refers to the minutes of Scott's sentencing on the robbery charges.  (Docket
No. 15).  "T-1" refers to volume 1 of the trial transcript.  (Docket No. 10).  "T-2" through "T-4"
refer to volumes 2 through 4 of the transcript.  (Docket Nos. 11-13).  "H." refers to the transcript
of the hearings held before Justice Marcy L. Kahn in January 1997 prior to the robbery trial.

Torres imposed a concurrent indeterminate sentence of four and one-half to nine years of imprisonment on the drug charge. (Pet. ¶ 3; Danburg Decl. Ex. A at 5).

In his habeas petition, Scott asserts eight grounds for relief. (Pet. Addendum A-B). Scott contends that: (a) the trial court's failure to inquire about the prejudicial effect of comments made by a prospective juror at the sidebar within the earshot of other jurors deprived him of a fair trial; (b) certain of the prosecutor's comments in summation were improper; (c) testimony regarding a pretrial identification of him through a photo array constituted improper bolstering and deprived him of a fair trial; (d) evidence establishing his consciousness of guilt was improperly introduced; (e) the prosecution's questioning concerning his prior "bad acts" violated the court's pretrial ruling pursuant to People v. Sandoval, 34 N.Y.2d 371 (1974); (f) his conviction on the robbery counts was against the weight of the evidence; and (g) his sentence on those counts was excessive. (Pet. Addendum A-B). Scott also contends that if this Court grants habeas relief with respect to his robbery conviction, he also is entitled to vacate his guilty plea because it was entered on the basis of a promise that he would receive a concurrent sentence. (Id., Point VII).

For the reasons that follow, Scott's petition should be denied. Additionally, because Scott has failed to make a substantial showing of the denial of a constitutional right, as required by 28 U.S.C. § 2253(c)(2), a certificate of appealability should not be issued.

---

(Docket No. 14).

II.     Background

   A.     Sandoval and Other Evidentiary Pretrial Rulings

            On January 27, 1997, prior to jury selection, Justice Leibovitz held a

Sandoval hearing to determine the extent to which Scott could be questioned about his

prior criminal history if he chose to testify.  (T-1 at 1, 7).  At the hearing, the prosecutor

sought leave to cross-examine Scott about seven prior convictions:  two 1987 felony

convictions for Grand Larceny in the Third Degree and Attempted Robbery in the First

Degree; a 1984 misdemeanor conviction for Trespass in the Third Degree; and four 1996

misdemeanor convictions for Criminal Possession of a Controlled Substance in the

Seventh Degree, Trespass and Menacing in the Second Degree, and Assault in the Third

Degree.  (Id. at 8-11).  The prosecutor indicated that she wished to inquire generally about

certain of these crimes, while delving into the facts underlying others.  (Id. at 11-13).  In

addition, the prosecutor expressed a desire to cross-examine Scott about several cases

which had not resulted in a conviction because Scott allegedly engaged in witness

tampering.  (Id. at 13-18).  Justice Leibovitz ruled that Scott could be cross-examined

about the fact that he had prior felony and misdemeanor convictions, but not the specific

charges or the underlying facts.  (Id. at 26-27).  The Justice also excluded any mention of

Scott's other prior bad acts.  (Id. at 27).

            Following this ruling, Justice Leibovitz asked counsel whether there were

any evidentiary issues that could be addressed before trial.  (Id.).  In response, defense

counsel noted that the People intended to introduce evidence of intimidating phone calls which allegedly had been made to prospective trial witnesses by Scott's relatives. (Id. at 35-36). He argued that the Court should not permit the use of this evidence to prove Scott's consciousness of guilt because there was nothing to indicate that Scott was responsible for the calls and that the callers had not acted on their own. (Id. at 36-39, 43). The prosecutor maintained that the requisite nexus was established by the callers' references to the potential sentence faced by Scott and, in one tape-recorded call, the fact that they had been ordered to make the calls. (Id. at 40-41). Additionally, in one of the calls, an individual believed to be Scott's mother stated to a witness that her innocent son was in jail and that she knew that the witness was cooperating with the District Attorney's Office. (Id. at 40-42). The prosecutor also urged the Court to take into consideration Scott's history of witness tampering in other cases. (Id. at 42-43).

Justice Leibovitz rejected this proffer, stating that there was an insufficient connection between Scott and the calls. (Id. at 45). Nevertheless, the Justice stated that this ruling was "open to any further developments" and suggested that the prosecutor attempt to determine the origin of the phone calls. (Id. at 45-46). He warned that if Scott could be tied to the calls, he might admit the evidence and order the arrest of the caller. (Id. at 46).

On February 3, 1997, which was the second day of trial testimony, the prosecutor informed the court that someone impersonating a legal secretary at the District

4

Attorney's Office had previously called a prosecution witness, Carmen Martinez ("Martinez"), in an effort to secure the home address and telephone number of one of the victims, Charlie Cabrera ("Cabrera"). (T-2 at 4-5). Telephone company also records established that someone using Scott's personal identification number at Riker's Island had made a total of four calls to Martinez's home on September 24 and 25, 1996. (Id. at 2-4; T-3 at 232-33, 236). The substance of those four calls was not threatening in nature: the caller merely asked whether they were sure they had the right man. (T-3 at 234-35). Records further established that Scott's Riker's identification number had been used on December 30, 1996, to call his wife[2] before someone at her residence telephoned Martinez and then, one minute later, also called Cabrera. (Id. at 241-42; T-2 at 4). The telephone records proffered by the prosecution also showed that on January 22, 1997, Scott's identification number was used to call an unlisted number and that, subsequently, on January 23, 1997, threatening phone calls were made from that number to the homes of Cabrera and Martinez. (T-3 at 243-48).

On February 5, 1997, the court ruled on the admissibility of this evidence. (Id. at 231). After denying a defense request for an evidentiary hearing, the court held that the four phone calls to Martinez's home were "in and of themselves without reference to any of the[ir] contents . . . prima facie made by [Scott], with his access number, to a key

_____

[2]     Although I have referred to this individual as Scott's wife, it appears that she may only have been his girlfriend. (See T-3 at 241).

witness in this case for the purpose of possible intimidation and harassment." (Id. at 252, 272). The court further concluded that the phone calls made to Scott's wife using his pin number, and the subsequent calls from his wife's number to the homes of Martinez and Cabrera, were "part of a systematic effort to intimidate the witnesses in this case." (Id.). Finally, the court found that in January 1997 a phone call was made to an unlisted phone number, again using Scott's pin number, and that two threatening telephone calls subsequently were made from that unlisted number to the homes of both Cabrera and Martinez. (Id. at 273).

The court found that the prosecution had presented "prima facie evidence . . . that [Scott] directly and indirectly attempted to intimidate the witnesses in this case and to harass them," and indicated that the People therefore could introduce the proposed evidence at trial. (Id.).

B.    Voir Dire

Jury selection began on January 28, 1997. (T-1 at 74). During the voir dire of the first panel, one of the prospective jurors, Lorraine Williamson ("Williamson"), asked to approach, after which the following discussion took place at the bench:

JUROR:              . . . . Where I grew up on 115th [S]treet[]
                    I know victim[,] I don't want to know
                    any part of him.

THE COURT:     You've seen who?

| JUROR: | The victim[.] I don't want to have any part of this. |
|---|---|
| THE COURT: | What victim? |
| JUROR: | The victim over here. |
| THE COURT: | Are you talking about the defendant? |
| JUROR: | Ahum. |
| THE COURT: | So you know him? |
| JUROR: | No[.] I seen him before where you all talking about. I grew up around 114th [S]treet. |
| THE COURT: | You want to consent? |
| JUROR: | I got three children. |

(Id. at 199). After Williamson was excused on consent, defense counsel asked the court to dismiss the entire panel on the ground that Williamson's "heartfelt" statement "that she recognized [Scott] and feared him" had poisoned the well because it was heard by the other prospective jurors. (Id. at 199-200). Counsel did not ask that a hearing be held to question the other jurors. (Id.). Justice Leibovitz had the court reporter re-read the colloquy with the juror and then denied the defense request, stating:

> There was nothing said about fearing him. We just had the Reporter read it back and there is nothing in what she said even if heard that would have been prejudicial and I don't believe that what she said was loud enough to be heard. But[,] in any event[,] there was nothing prejudicial in what she said.

7

(Id. at 200-01) (emphasis added).

C.      Trial

                1.      People's Case

                The People's proof at trial would have permitted a reasonable juror to find as

follows:

                a.      April 23 Robbery

                In the early morning hours of April 23, 1996, Anthony Gonzalez

("Gonzalez") went to purchase some groceries at the sidewalk late night service window

of a store located on the corner of 112th Street and Lexington Avenue in East Harlem.  (T-

3 at 191-93).  Scott was ahead of Gonzalez on line and had already ordered by the time

Gonzalez arrived.  (Id. at 194-95, 286-89, 292).  While Gonzalez was waiting, Scott

banged on the service window, took his sandwich, and hit Gonzalez in the head as he

walked by him, causing Gonzalez to fall to the ground unconscious.  (Id. at 195-97, 295-

99).  Scott then went through Gonzalez's belongings, stealing his cash, a bracelet, and a

chain.  (Id. at 199-200, 299-301).

                As this was occurring, Fahmi Alsaidi ("Alsaidi"), the grocery store clerk,

called 911.  (Id. at 301-02).  While Alsaidi was on the phone, Scott looked up at him and

then ran away.  (Id. at 302).  Gonzalez then rose and went across the street to his

apartment.  (Id. at 198, 303-04).  His face was bleeding and his jaw hurt and was swollen.

(Id. at 197-99, 304).  An ambulance took Gonzalez to the hospital, where he had surgery a

8

few days after the incident.  (Id. at 200-03).  As a result of the attack, Gonzalez suffered a

broken jaw, and one cracked and one shifted tooth.  (Id. at 204-06).

Alsaidi knew Scott, who was a regular customer at the store.  (Id. at 286-87).

On May 2, 1996, he viewed a lineup at the 23rd Precinct and identified Scott as the person

who had attacked Gonzalez.[3]  (Id. at 308-13).  Gonzalez also viewed the lineup on that

date, but was unable to identify his assailant.  (Id. at 208-09).

b.      May 2 Robbery

On May 2, 1996, at approximately 2:15 a.m., Scott and a group of his

friends approached the corner of 115th Street and Second Avenue in Manhattan, where

Eduardo Sanchez ("Sanchez") was acting as a lookout for a drug dealer.  (T-1 at 553-54).

After Sanchez and Scott greeted each other, Martinez and Cabrera walked past them on

their way to a grocery store on the corner.  (Id. at 554-55).  After Scott asked Sanchez

whether he knew them, Sanchez replied that he had seen them around the neighborhood.

(Id. at 555).  Scott then told Sanchez that he was "going to take them off."  (Id.).

Once Martinez and Cabrera had made their purchases at the store, Scott

pursued them on his bicycle.  (Id. at 555-57).  As they were walking, Scott came toward

them from behind some bushes and benches, threw the bike to the ground, and punched

Cabrera in the jaw, causing him to fall to the ground and lose consciousness.  (Id. at 670;

T-2 at 44-46, 51).  While Cabrera was on the ground, Scott gouged his cheek with a

_____

[3]      The lineup procedure on that day was delayed because Scott initially refused to
participate.  (Id. at 383).

9

weapon.  (T-1 at 670-71).  He also stole jewelry that Cabrera was wearing.  (T-2 at 54-55).

After Scott left the scene, Cabrera regained consciousness, and he and Martinez went to her apartment.  (T-1 at 683; T-2 at 52-53).  Once there, Cabrera attempted to drink some water, but could not because there was a hole in his left cheek.  (T-1 at 683; T-2 at 53-54).  He also noticed that he was missing a tooth on that side of his mouth.  (T-2 at 53-54).  Martinez then called the police.  (T-1 at 683; T-2 at 55).  Cabrera described his attacker to the officers who responded as a strong black male, approximately five feet, eight inches tall, weighing 180 pounds, and without much hair on his head.  (T-2 at 61-62).

Cabrera subsequently was taken by ambulance to the hospital, where he had surgery for a broken jaw; he remained in the hospital for approximately one month, receiving medical treatment, as well as psychological treatment for auditory and visual hallucinations that he had not previously experienced.[4]  (T-2 at 58-59, 63-66, 70-71, 120-21; T-4 2/10 at 18).[5]  Following his release from the hospital, Cabrera viewed a lineup on

---

[4]        On cross-examination, the jury heard that Cabrera had used drugs, including cocaine, before and after the incident.  (Id. at 96-98).  Cabrera also testified that he entered a drug treatment program in August of 1996.  (Id. at 97-98).

[5]        Volume 4 of the trial transcript contains the separately paginated minutes of the proceedings held on February 10 and 11, 1997, respectively referred to as "T-4 2/10" and T-4 2/11."

June 6, 1996,[6] during which he identified Scott as the person who had attacked him on May 2, 1996. (Id. at 81, 86). Sanchez also viewed a lineup and identified Scott as the person he saw attack Cabrera. (T-1 at 565-69).

    c.    Scott's Arrest

Scott was arrested approximately one hour after he attacked Cabrera. (T-3 at 16). Police Officer Peter Nicolas ("Nicolas") who had responded to Martinez's apartment, was canvassing the area of 115th Street between First and Second Avenues, when he saw Scott riding a bicycle toward a group of people. (Id. at 18, 21-24). Scott dismounted and handed the bicycle to someone else when he made eye contact with Nicolas. (Id. at 25-26). Eventually, after the group dispersed, Nicolas and Sergeant Gross ("Gross"), who was accompanying Nicolas on patrol, began to follow Scott and a companion of his on foot. (Id. at 27). Although Nicolas directed them to stop, they continued walking and did not comply until Nicolas called out to them a second time. (Id. at 27-28). After a brief conversation during which Scott was not able to present any personal identification, Scott removed a knife from one of his pockets and placed it on the top of a dumpster. (Id. at 28-30). Scott then fled when Nicolas took out his handcuffs to place him under arrest. (Id. at 31). Another police officer arrested Scott following a brief chase. (Id. at 32).

    d.    Witness Tampering

---

[6]    The lineup was delayed because Scott arrived with bandages covering one eye and half his head. (T-3 at 119, 173-74). When the bandages were removed, it became apparent that Scott had suffered no injuries requiring such bandaging, and that this was simply a ruse to delay the proceeding. (T-3 at 120, 133-34, 174).

On January 23, 1997, at approximately 3:45 p.m., Johnny Gonzalez ("Johnny"), Cabrera's thirteen-year old nephew, was at Cabrera's home when he received a telephone call from an unidentified male.  (T-3 at 413-15).  The caller first asked to speak to Cabrera, then to Cabrera's sister.  (Id. at 418).  Subsequently, after learning that Johnny was there alone, the caller asked Johnny to tell Cabrera not to testify in court because "he don't want no further problems."  (Id.).  The caller also told Johnny that he knew where he and Martinez lived and gave him the correct addresses.  (Id. at 419-20).  Finally, the caller cautioned that Martinez should refrain from testifying as well.  (Id. at 420).  Johnny recorded the conversation using a tape recorder that the police had installed on Cabrera's phone a few days earlier, but the tape was damaged when Johnny rewound it and listened to it twice.  (Id. at 414-17).  After Johnny's testimony, the court instructed the jury on consciousness of guilt, directing them to consider that evidence for the sole purpose of determining whether Scott "displayed a consciousness of guilt" as to the May 2nd robbery.  (Id. at 434-35).

That same day, at approximately 3:45 or 4:00 p.m., Martinez received a similar call, which her daughter tape recorded.  (Id. at 440-41).  The tape of that conversation, during which the caller made reference to the call to Cabrera's home, was played for the jury.  (Id. at 264-65, 477).  The parties stipulated that the call originated from a location where Scott was not physically present.  (Id. at 485; see also id. at 264-65 (describing tape)).  Earlier, on December 30, 1996, Martinez received a telephone call

from a woman who claimed to be a secretary at the District Attorney's Office and asked for Cabrera's apartment number.  (Id. at 437-38).

Telephone records further established that Scott's Riker's Island phone access code was used on December 30, 1996 to place a call to a number registered to Scott's wife.  (Id. at 503-04, 536).  The records also showed that, on the same day, two phone calls were placed, minutes apart, to Cabrera and Martinez, from the number registered to Scott's wife.  (T-4 2/10 at 10-13).  Finally, the phone records showed that on January 22, 1997, Scott's personal access code was again used to call a number registered to a "Shawndell Riddick."  (Id.; T-3 at 539).  The following day, calls originating from that number were made to Cabrera at 3:45 p.m., and to Martinez at 3:48 p.m.  (T-4 2/10 at 10-13).

2.    Reference to Photo Array

During the prosecution's direct examination of one of the police witnesses, the following exchange took place:

> Q.    You arrested this defendant for a robbery that occurred
> on May 2nd, 1996?
>
> A.    Yes.
>
> Q.    How was it you broke the arresting information it that
> the arrest [sic] for the robbery that occurred on May
> 2nd, 1996?
>
> A.    Well, the defendant was pointed out from that photo
> array.
>
> [DEFENSE COUNSEL]:    Objection.

THE COURT:          Just a minute, members of
the jury, . . . , I am
sustaining the objection[,]
disregard that answer and it
is stricken entirely from the
record.

(T-3 at 453-54).  Immediately thereafter, Scott sought a mistrial, stating that it "is

elementary case law that [a photo array] is not admissible in court," and that the court's

prompt curative instruction "can't change the damage that has occurred."  (Id. at 456,

457).  Justice Leibovitz responded that he was "convinced" that the jury would follow the

law and denied the mistrial motion.  (Id. at 459).

      3.      Defense Case

The defense's first witness was Sudha Munver ("Munver"), a social worker

who interviewed Cabrera during his hospitalization following the incident.  (T-4 2/10 at

16-18).  Munver testified that Cabrera told her that he had sustained his injuries as a result

of being beaten by three people.  (Id. at 20).  Following Munver's testimony, the defense

introduced portions of Cabrera's hospital records.  (Id. at 43-47).

Scott was the only other defense witness.  (Id. at 46).  He testified that he

had been married for two years and had two daughters.  (Id. at 48).  Although Scott

admitted that he worked as a drug dealer in the area where the robberies took place, and

had felony and misdemeanor convictions, he denied committing the robberies charged.

(Id. at 48-50, 56-57, 68).  He contended that he ran from the police at the time of his arrest

14

because he was in possession of two "packs" of crack.[7]  (Id. at 55-56).  He further

contended that he and Alsaidi disliked one another.  (Id. at 58).  Specifically, Alsaidi was

upset about Scott's drug dealing in the vicinity of his store; Scott, in turn, was annoyed

that a fellow Muslim was selling non-halal products in his store.  (Id. at 58-59).

        When he was asked about the June 6th lineup, Scott explained that he had

received a bandage for an elbow injury, but used it to cover his face and head in an effort

to stall because his attorney was not present when he first was produced for the lineup.

(Id. at 61-63, 111).

        During his direct testimony, Scott conceded that he had asked another

inmate who knew the witnesses to call them using Scott's identification number in order to

proclaim his innocence, and tell them that he was facing fifty years in prison.  (Id. at 65-

68).  He further conceded that he had asked his wife and another individual to do the

same, but claimed that he never intended to threaten anyone.  (Id. at 67-68).

        On cross-examination, Scott denied the charges against him, stating that he

had never seen Gonzalez previously and did not have a knife on his person on the night of

his arrest.  (Id. at 78-80, 90-94, 98).  Scott also denied making any admissions to the police

while he was being fingerprinted. The testimony with respect to those alleged statements

was as follows:

> Q.    Don't you remember when you were being
> fingerprinted you told him, hey man watch the hands,
> they hurt?

---

[7]    A pack of crack cocaine consists of numerous bags.  (See id. at 53).

15

A.     Oh, yeah, I do remember now, yeah.

Q.     You remember Detective Popp telling you well [sic] stop punching people in the head?

DEFENSE COUNSEL:     Objection.

THE COURT:     Sustained.

Q.     Don't you remember telling Detective Popp I don't punch in the head anymore I punch in the jaw?

A.     No.

Q.     You didn't tell that to Detective Popp?

A.     No, I did not, my hand was hurting . . . because they stuck my hand out when they arrested me by the park they stomped me out. . . .

Q.     What happened to you?

THE COURT:     I am not going to allow this. Go on to your next issue.

Q.     Well, in addition to you saying I don't punch in the head, I hit in the jaw?

A.     I never said that.

THE COURT:     I said go on to the next question.

Q.     Didn't you also tell Detective Popp you're the president of the Thugs of New York?

DEFENSE COUNSEL:     Objection.

A.     No.

THE COURT:     Overruled.

A.     No, I didn't, I told him I am the president of the Smackers Association of America.

Q.     You didn't tell him about Thugs?

A.     No.

Q.     And the president - -

A.     No, I said Smackers Association of America.

Q.     Didn't you tell Detective Popp you won the Golden Glove Award?

       DEFENSE COUNSEL:     Objection.

       THE COURT:     Overruled.  Did you?

       THE WITNESS:     No, I did not.

Q.     You, didn't you brag about your being able to one punch and knock someone unconscious?

A.     No, I did not . . . no.

Q.     You didn't tell him you were a Golden Gloves champion two years in a row?

A.     Never that.

       DEFENSE COUNSEL:     Objection.

       THE COURT:     Overruled.

Q.     You deny all those statements?

A.     I deny that . . . .

(Id. at 108-10).[8]  After the defense rested, the prosecutor unsuccessfully sought to recall Detective Popp to testify about the statements Scott denied making while being fingerprinted.  (Id. at 123-24).

           4.     Conviction and Sentencing

           On February 11, 1997, the jury found Scott guilty on two counts of Robbery in the First Degree, but acquitted him with respect to a third such count and a count of Assault in the First Degree, both of which charged that Scott has possessed a dangerous instrument during the Cabrera robbery.  (T-4 2/11 at 30-31).  Prior to reaching that verdict, the jury sent out several notes seeking further explanation of the elements of the first count (charging Robbery in the First Degree), a read back of portions of Officer Nicolas' testimony, a description of Cabrera's injuries when admitted to the hospital, the elements of the charge of Assault in the First Degree, portions of Cabrera's medical records, and the elements of the count charging Scott with Robbery in the First Degree on the basis of his alleged possession of a dangerous instrument.  (Id. at 1-2, 9-10, 21-22, 27-28).

           Scott was sentenced on March 13, 1997.  (S. 1).  At the sentencing, the prosecutor urged the court to impose the maximum sentence of twenty-five years on each

---

[8]      Before Scott testified, his counsel sought a ruling from Justice Leibovitz regarding the admissibility of certain statements made by Scott at the time of the lineups.  (T-4 2/10 at 31-40, 104-06).  Although the various exchanges are somewhat confusing and hard to follow, Justice Leibovitz ruled in substance that any statements Scott made at the time of the lineups were inadmissible because their voluntariness had not been resolved prior to trial.  (Id. at 31-40, 104-06).  On the other hand, he indicated that any statements not connected to the lineups, including statements related to the "Smackers Association," could be explored on cross-examination.  (Id. at 104-06).

count, for a total of fifty years, noting that many of the witnesses who testified against Scott had relocated to other neighborhoods because they feared for their safety.  (Id. at 9-11).  The prosecutor also urged the court to take into account Scott's attempts to tamper with the witnesses prior to the trial, and the sidebar discussion with prospective juror Williamson, whom the prosecutor described as "in almost hysterics" and "desperately wanting to talk to the court the minute she saw who was on trial."  (Id. at 12).  Justice Leibovitz, however, refused to consider these factors in imposing sentence.  (Id. at 12-13).

In the course of sentencing Scott to two consecutive thirteen-year prison terms, the Justice explicitly stated that his sentencing decision would be based solely on the two counts on which Scott was convicted, without regard to any uncharged crimes, prior acquittals, or "tampering with witnesses in this case."  (Id. at 28-30).  Thereafter, however, the Justice noted the details of the crimes for which Scott was being sentenced and stated that Scott "was shown to [his] satisfaction to have tampered with witnesses."  (Id. at 32).  The Justice also made reference to the threatening tape-recorded conversation and the testimony of thirteen-year-old Johnny, concluding that Scott "not only [served] as a terrorist out on the streets of New York, but . . . terrorized the criminal justice system."  (Id. at 33-34).

C.     Procedural History

1.     Direct Appeal

Scott appealed the judgments of conviction resulting from the trial and his guilty plea to the Appellate Division, First Department.  In a consolidated brief challenging both judgments, Scott advanced the same eight claims he now asserts here.  (Danburg Decl. Ex. A).

On October 19, 2000, the Appellate Division unanimously rejected Scott's claims and affirmed the judgment of conviction.  People v. Scott, 714 N.Y.S.2d 62 (1st Dep't 2000).  In its decision, the Appellate Division held that the verdict was not against the weight of the evidence.  Id. at 63.  The court further found that Justice Leibovitz's denial of Scott's request to dismiss the entire panel of prospective jurors following Williamson's prejudicial sidebar comments was a proper exercise of discretion.  Id.  In arriving at this determination, the court noted that the trial judge's finding that the other jurors could not have heard the juror's comments was entitled to "great weight."  Id.  The court further observed that Scott's argument that the trial court should have questioned the other prospective jurors to determine whether they heard and were prejudiced by the remarks was not preserved for appellate review.  Id.  The court stated, however, that even if it were to reach the merits of that claim, it would find that, "although it would have been the better practice to conduct such an inquiry, the court's own observations sufficed."  Id.  The court noted further that the juror's remarks neither suggested that Scott had been involved in any crime, nor presented a risk of substantial prejudice.  Id.

The court further held that Scott's objections to the prosecutor's summation were not adequately preserved for appellate review. Id. The court also noted that if it were to review those objections, it would find that the prosecutor had not engaged in any "pattern of inflammatory, prejudicial remarks" and that "reversal [was thus] unwarranted." Id.

Finally, the court found that the brief mention of the photo array identification, followed by the trial court's prompt curative instructions, was not unduly prejudicial, that there was no abuse of sentencing discretion, and that Scott's remaining claims were meritless. Id. at 63-64.

By letter dated October 28, 2000, Scott's sought leave to appeal to the New York Court of Appeals on the basis of all eight issues raised before the Appellate Division. (Danburg Decl. Ex. D). That application was summarily denied on December 4, 2000. People v. Scott, 95 N.Y.2d 968 (2000).

2.    This Proceeding

Scott's habeas petition is dated October 29, 2001, and was timely received by the Pro Se Office of this Court on November 7, 2001. (See Pet. at 2, 7). In his petition, Scott reasserts the eight grounds raised by his counsel on direct appeal. (Pet. Addendum A-B). On January 4, 2002, this matter was referred to me for a Report and Recommendation. (Docket No. 2). After I granted several requests for an extension of time, the Respondent submitted his papers in opposition to Scott's petition on January 17,

2003. (See Docket Nos. 4-15). Thereafter, on June 3, 2003, Scott served and filed his "traverse." (Docket Nos. 19-20).

III.    Discussion

A.    Procedural Default

Under settled Supreme Court precedent, a federal court may not consider an issue of federal law raised in a state prisoner's petition for a writ of habeas corpus if the state court's prior denial of that claim rested on an adequate and independent state ground. See, e.g., Harris v. Reed, 489 U.S. 255, 262 (1989); Wainwright v. Sykes, 433 U.S. 72, 81 (1977). A finding of procedural default qualifies as such an adequate and independent state ground, Harris, 489 U.S. at 262, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claims will result in a fundamental miscarriage of justice." Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996) (quoting Coleman v. Thompson, 501 U.S. 722, 750 (1991)). Accord Fama v. Comm'r of Corr. Servs., 235 F. 3d 804, 809 (2d Cir. 2000).


To demonstrate cause, a petitioner must adduce "some objective factor external to the defense" which explains why he did not raise the claim previously. Murray v. Carrier, 477 U.S. 478, 488 (1986); Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991) (quoting Murray). The circumstances which may constitute cause include: (1) interference by government officials making compliance impracticable; (2) situations in which the factual or legal basis for a claim was not reasonably available to counsel; and (3)

ineffective assistance of counsel.  See Murray, 477 U.S. at 488; Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994) (quoting Murray).

A showing of prejudice requires a petitioner to demonstrate that failure to raise the claim previously had a substantial injurious effect on his case such that he was denied fundamental fairness.  Reyes v. New York, No. 99 Civ. 3628 (SAS), 1999 WL 1059961, at *2 (S.D.N.Y. Nov. 22, 1999).

Finally, to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent."  Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001).

Here, the Appellate Division found that Scott's argument that Justice Leibovitz should have conducted a hearing to determine the effect of juror Williamson's remarks was not preserved because Scott failed to request a hearing.  Although the Appellate Division "decline[d] to review [the claim] in the interest of justice, Scott, 714 N.Y.S.2d at 63, it further observed that, even though a hearing might have been desirable, it would have rejected the claim had it reached it because Justice Leibovitz's determination that the juror's remarks could not be heard by the rest of the panel "sufficed under the circumstances."  Id.  The Appellate Division also held that Scott's prosecutorial misconduct claim was unpreserved because his counsel voiced only general objections at trial.  Id.  Once again, however, the court noted that if it were to review that claim, it would have found that it lacked merit.  Id.

The failure of Scott's counsel to comply with New York's contemporaneous objection rule, Crim. Proc. L. § 470.05(2), constitutes an adequate and independent state procedural ground for the denial of these claims. Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990); Taylor v. Harris, 640 F.2d 1, 1-2 (2d Cir. 1981). Accordingly because Scott has established neither cause for his procedural default nor that he is actually innocent, this Court lacks jurisdiction to entertain these claims. This jurisdictional bar applies even though the Appellate Division ruled in the alternative on the merits of the claim. See Glenn, 98 F.3d at 724; Velasquez, 898 F.2d at 9.

D.      Merits

Although a federal court obviously need only address claims which are not procedurally barred, it is understandable that an inmate serving a sentence as long as the one imposed on Scott would want the merits of his claims to be reached. Moreover, there is always the possibility (however remote) that another court could reach a different conclusion concerning the threshold issue of procedural forfeiture. For these reasons, I have considered the merits of each of Scott's claims. As shown below, none warrant habeas relief.

1.      Standard of Review

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court. Herrera v. Collins, 506 U.S. 390, 401 (1993). Rather, a state prisoner seeking habeas relief under Section 2254 must show that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The petitioner bears the burden of proving, by a preponderance of the evidence, that his rights have been violated. Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides, in part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit noted in Jones, the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'" Jones, 229 F.3d at 119. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. This standard does not require that reasonable jurists would all agree that the state court was wrong. Id. at 409-10. Rather, the standard "falls

somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'"
Jones, 229 F.3d. at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Finally, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that "a determination of a factual issue by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail." Williams, 529 U.S. at 389.

2.    Jury Claim

Scott's first claim, which is the primary focus of his "Traverse" is that he was deprived of a fair trial by virtue of Justice Leibovitz's refusal to dismiss the first panel of prospective jurors. (Pet. Addendum A-B, Point I). Scott also contends that the Justice should have inquired whether the panel heard juror Williamson's sidebar remarks. (Id.).

"[T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors," Irvin v. Dowd, 366 U.S. 717, 722 (1961), free

from "predisposition about the defendant's culpability." <u>Gomez v. United States</u>, 490 U.S. 858, 873 (1989) (citing <u>Irvin</u>).  Nevertheless, "[d]ue process does not require a new trial every time a juror has been placed in a compromising situation." <u>Smith v. Phillips</u>, 455 U.S. 209, 217 (1982).  Consequently, the decision whether to grant a hearing to determine whether there has been any prejudice to a defendant is a matter within the court's discretion.  <u>See</u> <u>United States v. Gaskin</u>, 364 F.3d 438, 463-64 (2d Cir. 2004); <u>United States v. Diaz</u>, 176 F.3d 52, 78 (2d Cir. 1999).

On habeas review, Justice Leibovitz's factual finding that Williamson's statements at the sidebar were not sufficiently loud to be heard by the other prospective jurors must be presumed to be correct.  <u>See</u> 28 U.S.C. § 2254(e)(1).  Indeed, that presumption can be overcome only by clear and convincing evidence to the contrary.  <u>See</u> 28 U.S.C. § 2254(e)(1).  Here, the only evidence in the record that Scott is able to cite relates to the court's next sidebar discussion with a prospective juror, which began with an admonition to "speak very quietly."  (T-1 at 208).  Although Scott reads this as a tacit admission that Williamson did not speak sufficiently quietly, it is equally plausible that Justice Leibovitz merely was reacting to counsel's suggestion that Williamson's remarks could be overheard.  For this reason, the court's second sidebar discussion does not constitute the necessary clear and convincing evidence that Justice Leibovitz's factual finding was wrong.

Scott also suggests that Williamson's comments must have been both audible and prejudicial because she was "hysterical" while in the courtroom.  (Pet.

Addendum A-B, Point I). This contention is based on the remarks of the prosecutor, who argued in connection with sentencing that Williamson's statements at the sidebar, which she described as having been made "in almost hysterics," established that Scott had ruled his neighborhood "through fear." (Id. (quoting S. 12)). This assertion shows that there was, in fact, some basis for Scott and his counsel to be concerned about Williamson's remarks. Nonetheless, it plainly does not constitute clear and convincing evidence that they were right and that Justice Leibovitz was wrong. Accordingly, as is often the case under the AEDPA, the Court is not in a position to second guess the state court trial judge, who must be presumed to have been correct in finding that Williamson's remarks were not overheard by the other prospective jurors. See Patton v. Yount, 467 U.S. 1025, 1038 (1984) ("the trial court's resolution of such questions [as juror credibility and demeanor] is entitled . . . to special deference") (internal quotation marks omitted).

On this record, the Court cannot say that Justice Leibovitz acted unreasonably in concluding that Scott was not prejudiced. Indeed, despite the presence of four members of the first panel on the jury, Scott was acquitted of two serious charges – a

In any event, even if Williamson's demeanor was "hysterical" and her remarks were overheard, the fact remains that she did not directly state, as Scott alleges, that she was afraid of Scott, nor did any of her statements imply that he was connected to or guilty of the crimes with which he was charged. Instead, Williamson simply indicated that she had seen Scott in the area where she grew up, that she had three children, and that she did not want to take part in the trial. (T-1 at 199).

result that presumably would not have obtained if the process of selecting the jurors had prejudiced him.

In these circumstances, there is no basis for Scott's tainted jury panel claim.

### 3. Prosecutorial Misconduct

Scott next contends that certain of the prosecutor's summation comments were so egregious as to require a new trial. (See Pet. Addendum A-B, Point II; Traverse 15-22).

A claim of prosecutorial misconduct during summation requires a court to consider "whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)). The issue is not simply whether the prosecutor's comments were "undesirable or even universally condemned." Id. Accordingly, a mere showing of prosecutorial misconduct does not entitle a petitioner to habeas relief. Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994). There must, instead, be a showing that the petitioner "suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." Id. In determining whether the petitioner suffered such prejudice, a court must consider: "(1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prejudicial conduct." Id. (citing Gonzalez, 934 F.2d at 424).

The prosecutor's summation in this case spans some fifty transcript pages, much of which was unquestionably proper. Scott nevertheless takes issue with certain of the prosecutor's words and arguments, alleging that they deprived him of a fair trial. The remarks to which Scott objects cannot be viewed in isolation. Rather, as the Second Circuit observed in United States v. White, 486 F.2d 204, 207 (2d Cir. 1973), the "fine line which distinguishes permissible advocacy from improper excess [must be] drawn within the concrete terrain of specific cases."

Scott's first fussilade is directed to the prosecutor's use of such words as "vicious, brutal, lurking, torture, savage, and senseless." (Traverse at 18-20). The evidence established, however, that Scott preyed on two defenseless victims, one of whom was mutilated for no apparent reason. Given the nature of the attacks, each of the words to which Scott objects was an apt description of his criminal acts. Scott cannot secure the reversal of his conviction simply because the prosecutor's description of what he in fact did struck hard blows. See Berger v. United States, 295 U.S. 78, 88 (1935) ([W]hile the prosecutor may strike hard blows, he is not at liberty to strike foul ones.").

Scott also complains that the prosecutor improperly suggested that Cabrera's hallucinations were sequelae of the incident in which he was attacked and robbed. (Traverse at 17-18). Cabrera testified, however, that he did not have a similar problem before he was hospitalized following the robbery. (T-2 at 131-34). Accordingly, the prosecutor's argument was nothing more than a reasonable inference from the evidence. See United States v. Gerry, 515 F.2d 130, 144 (2d Cir. 1975).

To be sure, there were instances in which the prosecutor's remarks arguably crossed the line. However, in each such instance, Justice Leibovitz promptly instructed the jurors to disregard the objectionable remarks. (See T-4 2/10 at 172, 188, 190, 214, 215, 218). The jury must be presumed to have followed these instructions. See Weeks v. Angelone, 528 U.S. 225, 234 (2000).

Finally, Scott alleges that the prosecutor improperly vouched for witness Alsaidi by arguing that he "had to admit to being here in this country illegally." (Traverse at 20 (citing T-4 2/10 at 187)). This apparently is a reference to Scott's contention on appeal that the prosecutor had improperly argued that Alsaidi had exposed himself to adverse immigration consequences by testifying when she allegedly knew full well that there would be none. (Danburg Decl. Ex. A at 41). Assuming, arguendo, that this argument was improper, it certainly was not enough to tip the scales against Scott.

For these reasons, Scott's claim of prejudicial prosecutorial misconduct in summation lacks merit.

        4.    Photo Array Identification Testimony

Scott next contends that a police witness' unsolicited statement that he previously had been identified from a photo array deprived him of the right to a fair trial by improperly bolstering the other identification testimony. (Pet. Addendum A-B, Point III).

Bolstering claims typically arise under New York law when one witness confirms an identification previously made by another witness. See Snow v. Reid, 619 F. Supp. 579, 582 (S.D.N.Y. 1985) ("The concept of 'bolstering' . . . [is] derived from

31

People v. Trowbridge, 305 N.Y. 471 (1953), which holds that it is error to permit an identification made by one witness to be corroborated by the testimony of another witness who merely testifies that the identification did occur."). Whatever the merits of this claim may be as a matter of state law, a bolstering violation does not give rise to a claim under the United States Constitution. Id. For this reason, it is not cognizable on federal habeas review. See Diaz v. Greiner, 110 F. Supp. 2d 225, 234 (S.D.N.Y. 2000) (collecting cases).

Additionally, Scott suffered no prejudice as a result of the fleeting reference to the photo array. At the outset, the officer's testimony did not suggest that the array consisted of criminal mug shots. Moreover, even if the jury had so surmised, Scott testified that he had seven prior criminal convictions. The reference to the photo array therefore did not tell the jury something it otherwise would not have known. Justice Leibovitz also promptly cured the improper reference to the photo array identification by striking it from the record and instructing the jurors that they were to disregard it. (T-3 at 454). As previously noted, the jurors must be presumed to have followed this instruction. See Weeks, 528 U.S. at 234.

Thus, the reference to the photo array identification did not violate Scott's due process rights and does not entitle him to habeas relief.

     5.     Evidentiary Claims

Scott's next two assignments of error arise out of the trial court's admission of evidence that Scott maintains should have been excluded.

Generally speaking, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," Estelle v. McGuire, 502 U.S. 62, 67-68 (1991), because "rulings by state trial courts on evidentiary issues, even if erroneous, do not rise to the level of constitutional violation," Copes v. Schriver, No. 97 Civ. 2284 (JGK), 1997 WL 659096, at *3 (S.D.N.Y. Oct. 22, 1997). To prevail on these claims, Scott consequently must show that the evidentiary errors are of such "constitutional dimension" that they deprived him of "fundamental fairness." Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988). This requires that the evidentiary error have had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Stated somewhat differently, the evidence "must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (quoting Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992)).

 

a.    Witness Tampering Evidence

Scott first contends that the trial court should not have admitted the witness tampering evidence because its probative value was far outweighed by its prejudicial effect. (Pet. Addendum A-B, Point IV). Scott notes that the testimony regarding his prison telephone records and the use of his Department of Corrections personal

identification number improperly revealed to the jury that he was in custody.  (Id.; Traverse at 22-26).  He also argues that there was an insufficient connection between him and the calls.  (Id.).

Under New York law, evidence of threats against witnesses is admissible when the evidence is "circumstantially connected to [the] defendant and [the jury] could fairly infer that it might have some tendency to prove consciousness of guilt."  People v. Cotto, 635 N.Y.S.2d 623 (1st Dep't 1995) (citing People v. Plummer, 36 N.Y.2d 161, 164 (1975), and People v. Griffin, 511 N.Y.S.2d 136 (2d Dep't 1987)).  The communications need not come from, but need only be connected to, the defendant.  See People v. Shilitano, 218 N.Y. 161, 178-79 (1916) (evidence properly received when "the action of the defendant's brother and his attorney in dealing with the witnesses [was] indicative of an effort to coerce witnesses and suppress evidence . . . and ha[d] some tendency to prove a consciousness of guilt").

In this case, Scott has not shown error – much less error of constitutional dimensions – resulting from the admission of the evidence concerning the threatening calls to witnesses.  Indeed, the prosecution showed that Scott's assigned personal identification number was used to make calls from Riker's Island to telephone numbers from which threatening phone calls to the witnesses subsequently were made.  There consequently was a sufficient connection between Scott and the phone calls warning the witnesses against testifying in court against him.  While the evidence may have been prejudicial, there is no indication that Scott sought to minimize the prejudice by stipulating that certain

of the calls had been made using his unique access number.  Even in the absence of such a

stipulation, however, Justice Leibovitz carefully instructed the jurors as follows:

> All right, now, members of the jury, the witness has just
> referred to the fact that the defendant Brett Scott has been in
> custody, obviously in jail.  I will instruct you that the fact that a
> person is in jail[,] in this case, Brett Scott, should not in in [sic]
> matter create any inference in your mind as to any of the
> charges in this case with regard to whether the defendant is
> guilty or not guilty.
>
> The mere fact that someone is in pre-trial custody has no
> bearing whatsoever on whether that person is guilty or not
> guilty.  And you are not in any manner to consider the fact that
> he is or has been in custody as being any evidence of his guilt
> as to any of the charges in this case.

(T-3 at 504).  Additionally, as the evidence regarding the calls was introduced, Justice

Leibovitz repeatedly instructed the jury that it could only be considered with respect to the

issue of Scott's consciousness of guilt.  (See T-3 at 434-35, 479-80; T-4 2/10 at 252-54).

For these reasons, Scott did not suffer any unfair prejudice when the

evidence of his efforts to intimidate the trial witnesses came before the jury.

### b.    Bad Acts Evidence

Scott next contends argues that the trial court erred by permitting the

prosecutor to cross-examine him about prior bad acts which exceeded the scope of what

Justice Leibovitz had ruled admissible during the Sandoval hearing.  (Pet. Addendum A-B,

Point V).  In particular, he appears to object to the questioning about his alleged statements

to Detective Popp concerning the "Thugs of New York" and his propensity to hit people in

the head.  (Id.).

Contrary to Scott's assertion, this ruling was not inconsistent with any prior rulings by Justice Leibovitz.  The Justice had ruled that any statements related to one of the lineups would be excluded, but that other statements, such as those at issue here, which were made independently of any compelled identification procedure, could be the subject of inquiry.  (See n. 8, supra).  Accordingly, there was no surprise to the defense, and the trial court did not err in allowing the questioning.

　　　　　　6.　　Weight of the Evidence

　　　　　　Scott also argues that his conviction was against the weight of the evidence. (Pet. Addendum A-B, Point VI).  A petitioner's claim that his conviction was contrary to the weight of the evidence is not cognizable on federal habeas review.  See Givens v. Burge, No. 02 Civ. 0842 (JSR), 2003 WL 1563775, at *10 (S.D.N.Y. Mar. 4, 2003) (collecting cases).  On the other hand, the sufficiency of the evidence used to convict a defendant is within a habeas court's purview.  A habeas petitioner challenging the sufficiency of the evidence nevertheless bears a "very heavy burden."  Knapp v. Leonardo, 46 F.3d 170, 178 (2d Cir. 1995) (internal quotation marks omitted).  To prevail, the petitioner must show that "no rational trier of fact could have found proof of guilty beyond a reasonable doubt."  Bossett, 41 F.3d at 830 (quoting Jackson v. Virginia, 443 U.S. 307, 324 (1979)).  Moreover, in considering such a sufficiency claim, a habeas court must weigh the evidence in the light most favorable to the prosecution and draw all permissible inferences in its favor.  Jackson, 443 U.S. at 326.

A sufficiency claim therefore does not permit the reviewing court to redetermine the credibility or reliability of witnesses or substitute its view of the evidence for that of the trier of fact.  See Marshall v. Lonberger, 459 U.S. 422, 434 (1983); Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996).  Rather, insofar as there is evidence from which the jury could have drawn an inference favorable to the accused but chose not to, the court must "defer to . . . the jury's choice of the competing inferences." United States v. Kinney, 211 F.3d 13, 18 (2d Cir. 2000) (quoting United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998)).  For this reason, "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction."  United States v. Danzey, 594 F.2d 905, 916 (2d Cir. 1979); see also Edwards v. Jones, 720 F.2d 751, 755 (2d Cir. 1983) (following Danzey even though the testimony and character of the sole witness who directly implicated the petitioner were "less than inspiring"); Means v. Barkley, No. 98 Civ. 7603 (DLC), 2000 WL 5020, at *4 (S.D.N.Y. Jan. 4, 2000) (applying Danzey and noting that habeas court may set aside conviction only if testimony is "incredible as a matter of law").

Here, Scott appears to base his weight of the evidence claim on the less than stellar personal attributes of the prosecution's witnesses.  (See Pet. Addendum A-B, Point VI).  However, even Scott does not have the temerity to suggest that the testimony of those witnesses, if believed, was insufficient to permit a jury to return a guilty verdict.  At trial, Scott was identified as the perpetrator of each of the robberies by at least one eyewitness.  That alone belies his argument concerning the sufficiency of the proof.

_____7.___Excessive Sentence_

_____Scott also claims that the sentence imposed on him by Justice Leibovitz is excessive and violates his Eighth Amendment rights. (Pet. Addendum A-B, Point VIII). He also argues that the Justice improperly used evidence of other crimes – namely, witness tampering – to enhance his sentence. (Id.). Scott further alleges that his combined twenty-six-year sentence must have been punishment for his decision to exercise his right to a trial, inasmuch as he had been offered a ten-year sentence as part of a proposed plea bargain prior to trial. (Id.).

These claims lack merit. Scott was convicted, as a second felony offender, on two counts of Robbery in the First Degree, a Class B violent felony, for which the minimum and maximum sentences are eight and twenty-five years respectively. N.Y. Penal Law §§ 70.02(1)(a), 70.06(6)(a), 160.15 (McKinney 2004). Because Scott's sentence on each count was well within that range – indeed, near the bottom of the range – his claim does not present a federal constitutional issue cognizable on habeas review. See White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) (citing Underwood v. Kelly, 692 F. Supp. 146 (E.D.N.Y. 1988), aff'd mem., 875 F.2d 857 (2d Cir. 1989)); Robles v. Senkowski, No. 97 Civ. 2798 (MGC), 2002 WL 441153, at *10 (S.D.N.Y. Mar. 21, 2002) (citing White).

In order to successfully challenge his sentence on the ground that the sentencing court improperly relied on uncharged crimes, Scott would have to show that the sentencing court's decision amounted to an arbitrary or capricious abuse of discretion

or that an error of law resulted in the court's improper exercise of its discretion. Odom v. Duncan, No. 99 Civ. 9088 (MBM), 2005 WL 3288140, at *1 (S.D.N.Y. Dec. 2, 2005). Here, Scott has made neither showing. Under New York law, a sentencing court may take into consideration a defendant's criminal history, including offenses which did not result in a conviction. See People v. Powell, 549 N.Y.S.2d 716, 716 (1st Dep't 1990) (there is "no legal impediment to the [sentencing] court's consideration of prior uncharged crimes and defendant's criminal history") (citing People v. Whalen , 99A.D.2d 883, 884 (3d Dep't 1984)). The federal rule is the same. United States v. Reese, 33 F.3d 166, 174 (2d Cir. 1994) ("[W]hen determining sentence, a sentencing court is free to consider . . . evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal.").

In the course of sentencing Scott, Justice Leibovitz made clear that he was not taking into account the prosecution's allegations regarding witness tampering in the case tried before him or earlier cases. (S. 29-30). Notwithstanding Scott's suggestion to the contrary, it seems obvious that the Justice in fact followed through on his pledge since he imposed sentences near the bottom of the permissible range for two violent crimes, in which Scott broke both of his victims' jaws, and disfigured and traumatized one of them. The fact that the Justice also noted that Scott had threatened witnesses and "terrorized the criminal justice system," (id. at 33-34), does not mean that he took any impermissible factor into account. Indeed, even if the court had taken witness tampering into account

and had imposed the fifty-year sentence that the prosecutor requested, Scott would not have any constitutional claim.

That Scott earlier was offered a ten-year sentence as part of a proposed plea bargain also does not suggest that the sentence imposed was improper. As the prosecutor explained at the sentencing, the People offered such a short sentence in an effort "to spare the victims of the trauma of having to testify." (Id. at 14). Thereafter, however. because of the defendant's threats, the prosecution's witnesses had to be relocated. (Id.). Accordingly when Scott wanted to plea "[o]n the eve of trial[,] . . . the People recommended 30 years." (Id.). Measured against this later offer, it is clear that the sentence imposed was lenient, not vindictive.

8.     Guilty Plea

Finally, Scott suggests that because his sentence on the drug charge to which he pleaded guilty was related to the sentence that Justice Leibovitz imposed following trial, it too must be vacated in the event that this Court grants the portion of his habeas petition addressing the robbery trial. (Pet. Addendum A-B, Point VII). This claim is moot since Scott is not entitled to habeas relief with respect to the robbery charges.

V.     Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have ten days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a) and (e). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard M. Berman, United States District Judge, and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, NY 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Berman. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).

Dated:     New York, New York
           August 18, 2006

_____
FRANK MAAS
United States Magistrate Judge

Copies to:

Hon. Richard M. Berman
United States District Judge

Brett Scott
# 97-A-2328
Green Haven Correctional Facility
Stormville, New York 12582

Jennifer K. Danburg, Esq.
Assistant Attorney General
State of New York, Office of the Attorney General
120 Broadway
New York, NY 10271